UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

ROLAND M. MATHYS

Defendant.

18-CV-00701-JGK

**ECF CASE**

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR DEFAULT JUDGMENT AGAINST <u>DEFENDANT ROLAND M. MATHYS</u>**

*Plaintiff Securities and Exchange Commission*
Mark L. Williams (NY Bar No. 4796611)
Nicholas P. Heinke (Colo. Bar No. 38738) (Pro Hac)
Senior Trial Counsel
Division of Enforcement
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1027 (Williams)
(303) 844-1071 (Heinke)
WilliamsML@sec.gov
HeinkeN@sec.gov

## **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT .................................................................................. 1

II.  FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 1

    A.  The Amended Complaint's Allegations of Insider Trading in Conjunction with
       a Tender Offer ................................................................................................. 1

    B.  Procedural History and Mathys's Default................................................................ 5

III. ARGUMENT ...................................................................................................... 7

    A.  Mathys is in Default.......................................................................................... 7

    B.  Default Judgment Standard.................................................................................. 7

    C.  The Complaint Establishes Mathys's Liability for Insider Trading in Conjunction
       With a Tender Offer .......................................................................................... 8

    D.  Mathys Should be Enjoined from Future Violations of the Securities Laws ................... 10

    E.  The Court Should Enter the Maximum Civil Penalty against Mathys ............................ 12

IV.  CONCLUSION.................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2010) ............................ 7

*Cotton v. Slone*, 4 F.3d 176 (2d. Cir. 1993) .................................................................. 7

*Daniello v. Planned System Integration Ltd.*, 2009 WL 2160536 (E.D.N.Y.2009) ................. 7, 8

*Finkel v. Romanowicz*, 577 F.3d 79 (2d. Cir. 2009) ....................................................... 7

*Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974) ............................................................... 8

*SEC v. Aly*, 2018 WL 4853031 (S.D.N.Y. Oct. 5, 2018) ..................................................... 10, 11

*SEC v. Fowler*, 440 F. Supp. 3d 284 (S.D.N.Y. 2020) ....................................................... 10, 11

*SEC v. Kinnucan*, 9 F.Supp.3d 370 (S.D.N.Y. 2014) ......................................................... 12, 13

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ........................................ 10

*SEC v. Mayhew*, 121 F.3d 44 (2d. Cir. 1997) .................................................................. 8, 9, 10

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*,

    2009 WL 3233110 (E.D.N.Y. 2009) ...................................................................... 11

*SEC v. Rajaratnam*, 822 F. Supp. 2d 432 (S.D.N.Y. 2011) ................................................. 13

*SEC v. Rosenthal*, 650 F.3d 156 (2d Cir. 2011) ............................................................... 12

*SEC v. Suman*, 684 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................................................ 9

*SEC v. Svoboda*, 409 F. Supp. 2d 331 (S.D.N.Y. 2006) ....................................................... 8, 10

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105

    (2d Cir. 1997) .............................................................................................. 8

*U.S. v. Whitman*, 555 Fed. Appx. 98 (2d. Cir. 2014) .......................................................... 9

**Statutes and Rules**

15 U.S.C. § 78u .................................................................................................. 10

15 U.S.C. § 78u-1 ................................................................................................ 7

17 C.F.R. §240.14e-3 ............................................................................................. 9

Fed. R. Civ. P. 55 ............................................................................................... 7

## I.    PRELIMINARY STATEMENT

Pursuant to this Court's September 10, 2020 Order, Doc. # 61, the SEC respectfully submits this memorandum of law in support of its application for default judgment, as well as a proposed default judgment order. On January 26, 2018, the SEC filed its Complaint against then-unknown traders in the securities of Bioverativ, Inc. Doc. # 2. The Complaint was later amended to specifically name Defendant Roland Mathys, a Swiss citizen and resident. Doc. # 37. As detailed below, the Amended Complaint alleges Mathys engaged in extensive insider trading in connection with a proposed tender offer for Bioverativ's securities. Specifically, Mathys purchased nearly 1,600 call option contracts in Bioverativ – a significant share of all reported trading in those options – based on material non-public information related to the yet-unannounced tender offer. This information allowed him to turn approximately $170,000 into nearly $5 million in a matter of weeks. When confronted about these trades by his banker, he lied and denied having any inside information. And rather than respond to the SEC's Amended Complaint – or the related indictment by the U.S. Attorney's Office – Mathys has stayed silent and outside of the jurisdiction of the U.S. courts. Mathys's failure to respond, coupled with the SEC's detailed allegations of his insider trading in violation of the federal securities laws, should result in the Court finding Mathys in default, entering permanent injunctions, and imposing the maximum civil penalty of three times his trading profits.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Amended Complaint's Allegations of Insider Trading in Conjunction with a Tender Offer.

The SEC's Amended Complaint details Mathys's illegal insider trading, and specifically his purchasing of call option contracts ("call options") of Bioverativ just prior to the public

- 1 -

announcement that Bioverativ was to be acquired by French *societe anonyme* Sanofi ("Sanofi")

for a substantial premium. *See* Doc. # 37 ¶¶ 1-6. By late 2017, Sanofi had taken substantial steps

to commence a tender offer for the acquisition of Bioverativ, including executing a

confidentiality agreement and commencing negotiations. *Id.* ¶¶ 13-14. On or about January 4,

2018, Sanofi offered (subject to due diligence) to purchase all of Bioverativ's outstanding shares

at a price of $105 per share, and the next day Sanofi and Bioverativ signed an agreement

providing Sanofi with exclusive rights to this potential acquisition until January 26, 2018. *Id.* ¶¶

15-16. The $105 price was a substantial premium, as Bioverativ's stock had not closed above

$65 per share at any point since it began trading on NASDAQ. *Id.* ¶ 3.

Mathys learned material non-public information about the Sanofi/Bioverativ tender offer

from a friend and former co-worker who was the son of a senior Sanofi executive (the "Sanofi

Insider"). *Id.* ¶ 2. Specifically, on or around January 5 and 6, 2018 – shortly after Sanofi offered

to purchase Bioverativ's shares and entered into the exclusivity agreement – the Sanofi Insider

attended a Sanofi executive committee meeting in California. *Id.* ¶ 17. At that meeting, the

Sanofi Insider learned material non-public information regarding the Sanofi/Bioverativ tender

offer, including that the companies had a deal in principle and that the deal was moving quickly

and would be announced in the coming few weeks. *Id.* The Sanofi Insider then spoke to his son,

where he relayed material non-public information that he had learned at the executive committee

meeting regarding Sanofi's impending acquisition of Bioverativ, and spoke of how busy he

expected to be in the coming weeks as a result. *Id.* ¶ 18. Shortly afterward, on or about January 9

or 10, 2018, the Sanofi Insider's son spoke to Mathys and relayed the material non-public

information concerning the Sanofi/Bioverativ tender offer that he had received from his father,

the Sanofi Insider. *Id.* ¶ 20. At the time of this conversation, the Sanofi/Bioverativ acquisition

had not yet been announced, and Mathys knew or had reason to know the information he was given was confidential, non-public, and came directly from the Sanofi Insider. *Id.* ¶ 21. Among other things, Mathys was close personal friends with the Sanofi Insider's son, had met the Sanofi Insider (through the son) on numerous occasions, and knew that the Sanofi Insider was an officer and employee of Sanofi. *Id.* ¶ 19.

Almost immediately after receiving this information, Mathys began aggressively purchasing Bioverativ call options.[1] *Id.* ¶ 22. From on or about January 12, 2018 through on or about January 19, 2018, Mathys purchased 1,607 Bioverativ call options, all of which were "out of the money" at the time of purchase and which were set to expire in just a few weeks. *Id.* ¶¶ 24-25. All of the Bioverativ call options purchased by Mathys were at a strike price of between $65 and $75, meaning Bioverativ's stock would have to trade above this price for the purchases to be profitable, even through Bioverativ had never closed above $65 in its entire trading history on the NASDAQ market. *Id.* ¶¶ 24-25, 28. And Mathys's purchases were significant: depending on the day, they were between 32% and 100% of all of the daily reported Bioverativ options trades in the particular options series. *Id.* ¶¶ 25, 27. The purchases were also unusual: in addition to the volume and risk, on information and belief, before January 2018 Mathys had never previously traded in Bioverativ securities. *Id.* ¶ 30

---

[1] Call options, like the ones purchased by Mathys, give a buyer the right, but not the obligation, to purchase a company's stock at a set price (the "strike price") for a certain period of time (through "expiration"). In general, one buys a call option when one expects the stock price to rise, or sells a call option when one expects the stock price to fall. If at the time of purchase the strike price for the call option is above the price at which the stock is then trading, the call option is "out of the money" because it would be unprofitable to exercise the call and pay more for the stock than if it were purchased on the stock market. *Id.* ¶ 23.  Out of the money options are riskier than in the money options, since if the stock price does not increase to the strike price prior to expiration the options expire worthless.

Before the markets opened on Monday, January 22, 2018, Sanofi and Bioverativ announced their agreement that Sanofi would acquire all of the outstanding stock of Bioverativ for $105 per share. *Id.* ¶ 31. As a result of the announcement, Bioverativ's stock price increased to approximately $104 per share – a more than 60% increase over its closing price on the prior trading day. *Id.* Mathys immediately began to liquidate his positions. On or about January 22, 2018, Mathys sold all of the $65 and $70 call options, receiving $2,636,820 in proceeds. *Id.* ¶ 32.[2] The next day, Mathys sold 75 of the $75 call options, and three days later sold another 250 $75 call options, for additional proceeds of approximately $912,250. *Id.* ¶¶ 33, 36.[3] The remaining options were exercised pursuant to this Court's order, discussed below, and resulted in proceeds of an additional approximately $1,568,732. *Id.* ¶ 37. All told, Mathys's trades resulted in profits of nearly $5 million on an investment of only approximately $170,000. *Id.* ¶¶ 26, 32-33, 36-37; *see also* Decl. of M. Hoke ¶¶ 5-8 & Ex. 1.

Mathys's post-trading behavior underscores his misconduct. On or about January 26, 2018, Mathys met with an employee of the bank at which he had purchased and sold the Bioverativ call options. *Id.* ¶ 39. At that meeting, Mathys feigned surprise at the success of his trades and falsely claimed that he had no dealings with anyone at Bioverativ or Sanofi and no information about the Sanofi/Bioverativ tender offer at the time of his trading. *Id.* ¶¶ 40-41. A few days later, on or about the week of January 29, 2018 – after the Court had frozen Mathys's assets, discussed below – Mathys met with the Sanofi Insider's son, told him he was under

---

[2] The amounts pled in the Amended Complaint did not deduct the additional fees charged to Mathys. As indicated in the declaration of Michael Hoke, submitted herewith, the proceeds to Mathys from these January 22, 2018 sales were approximately $2,635,478. *See* Decl. of M. Hoke, Ex. 1.

[3] Again, these amounts did not deduct the additional fees charged to Mathys. Deducting those fees yielded proceeds to Mathys of approximately $911,654. *See* Decl. of M. Hoke, Ex. 1.

investigation for insider trading in the shares of Bioverativ, and did not deny that he had engaged in misconduct. *Id.* ¶ 43. Mathys further instructed the Sanofi Insider's son not to communicate with him about the issue over the phone or via text or other messaging service. *Id.* Later that week, Mathys and the Sanofi Insider's son met again, and Mathys told him that he believed he could not successfully contest the SEC's allegations. *Id.* ¶ 44. Mathys did not deny the truth of the SEC's allegations, nor did he offer any alternative reasons for his trades. *Id.* On or around March 24, 2018, Mathys and the Sanofi Insider's son met once more. This time, the Sanofi Insider's son told Mathys that not only was Mathys in trouble for his trades, but that he and his father, the Sanofi Insider, could also be in trouble because of Mathys's trading in Bioverativ. *Id.* ¶ 45. Mathys did not deny the SEC's allegations, and did not offer alternative reasons for his trades, but instead apologized for creating trouble for the Sanofi Insider and his son. *Id.*

### B.    Procedural History and Mathys's Default

As noted above, the SEC's Complaint was filed on January 26, 2018 – just days after the Sanofi/Bioverativ tender offer was announced. Doc. # 2. The SEC obtained an asset freeze over the proceeds of the illicit trades, *see* Docs. ## 1, 14, and the Swiss Federal Office of Justice ("FOJ") also issued a "blocking order" freezing the Swiss accounts holding the proceeds of those trades. *See* Doc. # 7 ¶ 7. On February 15, 2018, this Court further ordered that the remaining call options that had not been exercised at the time of the asset freeze could be exercised in the ordinary course, and that the proceeds would remain frozen in the United States. *See* Doc. # 16. After obtaining both informal and formal discovery, *see* Docs. ## 26, 32, on June 13, 2019, the SEC filed its Amended Complaint naming Mathys as the defendant. Doc. # 37. On August 2, 2019, the SEC received confirmation that Mathys had been served with the Amended Complaint pursuant to the 1965 Hague Convention on Service Abroad and Extrajudicial Documents in Civil

or Commercial Matters ("Hague Convention"). *See* Doc. # 43. Mathys did not answer or otherwise respond to the Amended Complaint, and on February 21, 2020, the Clerk of the Court issued a certificate of default. Doc. # 54. On May 4, 2020, the Court ordered Mathys to show cause why a default judgment should not be entered against him. Doc. # 55; *see also* Doc. # 57 (Amended Order). The SEC served Mathys with the show cause order pursuant to the Hague Convention. *See* Doc. # 60. Mathys has not responded.

On the same day the SEC filed its Amended Complaint, Mathys was indicted by the U.S. Attorney's Office for the Southern District of New York for the same conduct at issue in this case. *See United States v. Mathys*, 1:19-cr-00442-DLC (S.D.N.Y.). The SEC understands Mathys remains outside of the jurisdiction of the United States, and based on the undersigned's review of the criminal case docket, Mathys has not yet appeared in the criminal case. On January 21, 2020, the United States filed a verified complaint for forfeiture of the proceeds of Defendant Mathys's illegal trading from Mathys's Swiss accounts.[4] *See United States v. CHF 2,362,717.30 in Swiss*

---

[4] Although approximately $2.2 million that stemmed from certain of Mathys's trades – and specifically sales on January 26 and February 16, 2018 – was held in the United States; *see, e.g.*, Doc. # 37 ¶¶ 36, 37, the SEC understands from discussions with counsel for Credit Suisse Securities (USA) LLC in connection with the civil forfeiture action that the profits from all of Mathys's trades (including the January 26 and February 16 sales) were also frozen in Mathys's Swiss accounts pursuant to the blocking order issued by the Swiss FOJ. *See* Verified Compl. for Forfeiture ¶ 22, *United States v. CHF 2,362,717.30 in Swiss Currency*, 20-cv-00544-JGK (Jan. 21, 2020). More specifically, Credit Suisse Securities (USA) LLC froze approximately $2.2 million (the amount of the proceeds of the January 26 and February 16 sales) that had been credited to one of Mathys's Swiss accounts consistent with the FOJ's blocking order, and also kept approximately $2.2 million frozen in the U.S. to comply with this Court's Orders. *See* Docs. ## 14 (preliminary injunction), 16 (order permitting exercise of options contracts). In other words, as explained to the SEC by counsel for Credit Suisse Securities (USA) LLC, because of this Court's Orders that directed certain monies remain in the United States, there is an over-freeze of approximately $2.2 million.  In light of the civil forfeiture order, which forfeited the profits from all of Mathys's trades from his Swiss accounts, *see* Judgment of Forfeiture, *United States v. CHF 2,362,717.30 in Swiss Currency*, 20-cv-00544-JGK (Apr. 30, 2020), the SEC requests that the funds frozen here in the United States be released back to Credit Suisse. *See* Prop. Order ¶ IV.

*Currency*, 20-cv-00544-JGK. On April 30, 2020, this Court entered a final judgment of forfeiture and ordered the proceeds forfeited to the United States. *See id*. Doc. # 7. The SEC understands that this Order has been transmitted to the appropriate Swiss authorities.

## III.   ARGUMENT

As outlined below, the Court should enter a judgment and order finding Mathys in default; enjoining Mathys from future violations of the provisions of the federal securities laws charged in the Amended Complaint; and requiring Mathys to pay civil monetary penalties pursuant to Section 21A of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-1.

### A.   Mathys is in Default.

The Clerk of the Court has certified that Mathys has failed to answer or otherwise move with respect to the Amended Complaint, and has noted Mathys's default. Doc. # 54; *see also* Fed. R. Civ. P. 55(a). Therefore, Mathys is in default and, pursuant to Fed. R. Civ. P. 55(b), the Court should enter the SEC's requested default judgment against him.

### B.   Default Judgment Standard

On a default judgment motion, all well-pled factual allegations of the Complaint (except those relating to damages) are to be accepted as true. *See, e.g.*, *Cotton v. Slone*, 4 F.3d 176, 181 (2d. Cir. 1993); *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2010) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint."). The Court must then assess whether those allegations establish the defendant's liability, drawing all reasonable inferences in the moving party's favor. *See, e.g.*, *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d. Cir. 2009).

"Federal Rule 55(b) requires the court to make an independent assessment of damages when deciding a motion for default judgment." *Daniello v. Planned System Integration Ltd.*,

2009 WL 2160536, at *4 (E.D.N.Y.2009) (citing *SEC v. Management Dyn., Inc.*, 515 F.2d 801, 814 (2d Cir.1975)); *see also Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (the "quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."). A court need not make this determination through a hearing. Rather, a court may rely on affidavits or documentary evidence to determine the appropriate amount of monetary relief. *See, e.g.*, *Daniello*, 2009 WL 2160536, at *4; *see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) ("We have held that, under rule 55(b)(2), it [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment."). The affidavit of Michael Hoke, submitted herewith, provides the evidence needed for this assessment.

### C.    The Complaint Establishes Mathys's Liability for Insider Trading in Conjunction with a Tender Offer.

Mathys is charged with violating Section 14(e) of the Securities Exchange Act of 1934 and Rule 14e-3 thereunder. *See* Doc. # 37 at 12. Section 14(e) is a "broad antifraud remedy in the area of tender offers," and the accompanying Rule 14e-3 "imposes liability on persons who trade on material, nonpublic information in connection with a tender offer without regard to whether the trader owes a fiduciary duty with respect to the confidentiality of the information." *SEC v. Mayhew*, 121 F.3d 44, 49, 53 (2d. Cir. 1997). "A defendant violates Rule 14e–3(a) 'if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reasons to know has been acquired "directly or indirectly" from an insider of the offeror or issuer, or someone working on their behalf.'" *SEC v. Svoboda*, 409 F. Supp. 2d 331, 341 (S.D.N.Y. 2006) (quoting *U.S. v. O'Hagan*, 521 U.S. 642, 669 (1997)). For liability to attach, a person or entity must have "'taken a substantial step or steps' to commence a tender offer." *Id.* (quoting 17 C.F.R. § 240.14e-3(a)). "Where the purchase or sale of a security occurs with

knowledge of this tender offer, 'it shall constitute a fraudulent, deceptive, or manipulative act or practice'" within the meaning of Section 14(e). *SEC v. Suman*, 684 F. Supp. 2d 378, 391 (S.D.N.Y. 2010) (quoting 17 C.F.R. § 240.14e-3(a)).

The allegations of the Amended Complaint make clear that Mathys violated these provisions. Mathys "kn[e]w[ ] or had reason to know," 17 C.F.R. §240.14e-3(a), that the information relayed to him was non-public. Mathys was an experienced business professional who obtained critical information about the Sanofi/Bioverativ tender offer from the son of a Sanofi executive, lied about that information to his banker, and never denied his misconduct in several post-trade interactions with the Sanofi executive's son. *See* Doc. # 37 at ¶¶ 12, 17, 18, 20; *see also id.* ¶¶ 39-41 (Mathys did not claim to bank employee that information was public, but rather deceitfully said he was surprised by trades' success and had no dealings with or information about Sanofi or Bioverativ); *id.* ¶¶ 42-45 (Mathys did not claim to Sanofi Insider's son that information was public and did not deny misconduct). Under these circumstances, it is plain that Mathys knew or had reason to know that the information was non-public.

The information was also clearly material: upon receiving the information, Mathys immediately began purchasing highly speculative, "out-of-the-money" call options that in some cases represented all or nearly all of the particular options series traded on a given day. *See id.* ¶¶ 22-25, 27, 30. *See also Mayhew*, 121 F.3d at 52 ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."). These allegations also show that Mathys – who, on information and belief, had never traded in Bioverativ securities before January 2018 – traded on the information. *See, e.g.*, *U.S. v. Whitman*, 555 Fed. Appx. 98, 107 (2d. Cir. 2014) (inside information must be "at least a factor" in trading decision); *see also* Doc. # 37 ¶¶ 42-45 (Mathys did not deny trading on information to Sanofi

Insider's son). Further, Mathys "kn[e]w[ ] or had reasons to know" that the information came

from an insider at Sanofi. *Svoboda*, 409 F. Supp. 2d at 341. Among other things, Mathys was

close personal friends with the Sanofi Insider's son, had met the Sanofi Insider (through the son)

on numerous occasions, and knew that the Sanofi Insider was an officer and employee of Sanofi.

Doc. # 37 ¶¶ 19, 21. Finally, Sanofi and Bioverativ had taken substantial steps to commence the

tender offer at the time of Mathys's trading: they had reached a deal in principle, signed an

exclusivity agreement, and were working on due diligence. *Id.* ¶¶ 15-17; *see also id.* ¶ 20. *See,*

*e.g.*, *Mayhew*, 121 F.3d at 53 (substantial steps taken when companies had retained consulting

firm, signed confidentiality agreements, and held meetings between top officials) (citing cases).

In sum, Mathys's conduct plainly violated Section 14(e) and Rule 14e-3.

### D.      Mathys Should be Enjoined from Future Violations of the Securities Laws.

Section 21(d) of the Exchange Act authorizes the Court to issue permanent injunctive

relief for violations of the federal securities laws. *See* 15 U.S.C. § 78u(d). Such relief is

appropriate "'when the defendant's past conduct indicates … that there is a reasonable likelihood

of further violation in the future.'" *SEC v. Aly*, 2018 WL 4853031, *2 (S.D.N.Y. Oct. 5, 2018)

(quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978)); *see also SEC*

*v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972) ("The critical question for a

district court in deciding whether to issue a permanent injunction in view of past violations is

whether there is a reasonable likelihood that the wrong will be repeated.").[5] "To determine

whether a permanent injunction is appropriate, a court should consider:

> [ (1) ] the fact that defendant has been found liable for illegal conduct; [ (2) ] the degree
> of scienter involved; [ (3) ] whether the infraction is an "isolated occurrence;" [ (4) ]

---

[5] Other courts have phrased it as a "substantial likelihood of future violations." *See, e.g.*, *SEC v.*
*Fowler*, 440 F. Supp. 3d 284, 300-01 (S.D.N.Y. 2020) (quoting *SEC v. Cavanagh*, 155 F.3d 129,
135 (2d Cir. 1998)).

whether defendant continues to maintain that his past conduct was blameless; and [ (5) ] whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Aly*, 2018 WL 4853031, *2-3 (quoting *Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100). In assessing injunctive relief, the public interest is paramount. *Fowler*, 440 F. Supp. 2d at 302.

These factors weigh substantially in favor of injunctive relief. As detailed above, Mathys is liable for illegal conduct. That conduct evidences scienter: in addition to his extraordinarily profitable trading on material non-public information, Mathys lied to his banker about the trading and his possession of inside information. Mathys's trading was not isolated, but rather occurred over multiple days and often constituted all or nearly all of the particular options series traded on a given day. Mathys's failure to appear in both this case and the parallel criminal case evidences a refusal to accept any blame. *See, e.g.*, *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, 2009 WL 3233110, at *5 (E.D.N.Y. 2009) ("[W]here, 'as here, a party has failed to appear, that party fails to recognize his wrongdoing and provide assurances against further violations.'") (quoting *SEC v. China Energy Savings*, 2008 WL 6572372 at *8 (E.D.N.Y. 2008)); *cf. Aly*, 2018 WL 4853031, at *3 ("The Second Circuit has 'noted that the court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable.'") (quoting *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996)). And finally, Mathys, who is in his early 30s, works at a multinational corporation, and previously worked at a consulting firm, may well be in a position to engage in insider trading again. *See* Doc. # 37 ¶ 12. For all of these reasons, a permanent injunction against future violations of Section 14(e) and Rule 14e-3 is warranted.

### E.    The Court Should Enter the Maximum Civil Penalty against Mathys.

Finally, the Court should order Mathys to pay the maximum civil penalty. Section 21A of the Exchange Act "authorizes the SEC to seek, and the district court to impose, a civil penalty for insider trading—*i.e.*, for 'purchasing or selling a security ... while in possession of material, nonpublic information in, or ... communicating such information in connection with, a transaction....'" *SEC v. Rosenthal*, 650 F.3d 156, 159 (2d Cir. 2011) (quoting 15 U.S.C. § 78u–1(a)(1)). Under Section 21A, the amount of penalty "'shall be determined by the court in light of the facts and circumstances,' and 'shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication.'" *Id.* (quoting 15 U.S.C. § 78u–1(a)(2)). In making this determination, courts consider factors such as

> "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."

*SEC v. Kinnucan*, 9 F.Supp.3d 370, 377 (S.D.N.Y. 2014) (quoting *SEC v. Rajaratnam*, 822 F.Supp.2d 432, 433 (S.D.N.Y. 2011)).

In this case, three times Mayths's profits gained equals $14,834,053.90. *See* Decl. of M. Hoke at ¶ 8 & Ex. 1 (Mathys's profits equaled $4,944,684.64). The maximum civil penalty is appropriate. As noted above, Mathys repeatedly purchased highly speculative options contracts over several days, frequently purchasing all or nearly all of the particular options series traded on a given day. Mathys's insider trading was so egregious that he turned an investment of approximately $170,000 into profits of nearly $5 million in a just a few weeks. When confronted, he lied to his banker about the trading and his possession of inside information. Rather than come forward to face the charges brought by the SEC (and by the U.S. Attorney's Office), he has

chosen not to respond and to remain outside of the jurisdiction of the United States courts. The

SEC has no reason to believe there is a need to reduce the penalty due to his financial condition –

he is a young executive, employed by a multinational company and prior to that a consulting

firm. Perhaps more to the point, because of his failure to appear, Mathys certainly has not

demonstrated any need to reduce the penalty due to his financial condition. Under these

circumstances, the Court should order Mathys to pay the maximum civil penalty. *See Kinnucan*,

9 F. Supp. 3d at 377 (imposing maximum three time penalty for conduct that was egregious and

involved a high degree of scienter)[6]; *see generally Rajaratnam*, 822 F. Supp. 2d at 434 ("SEC

civil penalties, most especially in a case involving such lucrative misconduct as insider trading,

are designed, most importantly, to make such unlawful trading a money-losing proposition not

just for this defendant, but for all who would consider it, by showing that if you get caught ... you

are going to pay severely in monetary terms.").[7]

## IV.   CONCLUSION

For the forgoing reasons, the SEC respectfully requests the Court enter the attached

proposed order finding Mathys in default, permanently enjoining him from future securities law

violations, imposing the maximum civil penalty, and releasing the $2.2 million frozen at Credit

Suisse Securities (USA) LLC from the asset freeze in this case.

---

[6] Unlike Mathys, Kinnucan appeared in his criminal case, and pled guilty. *See id.* While the whole of Kinnucan's conduct occurred over a period of two years, he was specifically charged with tipping two people within a three-week period. *See id.* at 372-373.

[7] The SEC is not seeking disgorgement or related prejudgment interest in light of the civil forfeiture order against Mathys. *See supra* n. 2. The SEC recognizes that, in seeking Court authorization for the exercise of the options contracts that had not been exercised at the time of the temporary restraining order, the SEC anticipated that it may be possible to return the proceeds of those option sales to the issuers of the options contracts through disgorgement or another mechanism. *See* Doc. # 15 at 6; *see also* Tr. of Prelim. Inj. Hearing at 4-12 (Feb. 9, 2018). However, in light of all of the above, including that the proceeds of the trading have been civilly forfeited, the SEC is not seeking an order of disgorgement.

Dated this 9th day of November, 2020.

        *s/ Nicholas P. Heinke*
Mark L. Williams (NY Bar No. 4796611)
Nicholas P. Heinke (Colo. Bar No. 38738) (Pro Hac)
Senior Trial Counsel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1027
WilliamsML@sec.gov
HeinkeN@sec.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the USDC for the Southern District of NY by using the CM/ECF system on November 9, 2020. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


*s/ Nicholas P. Heinke*